UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAROLD R. WALLACE, JR.,

        Plaintiff,                  Civil Action No. 12-11548

    v.                            District Judge Marianne O. Battani
                                        Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND TO**
**DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Plaintiff Harold Wallace, Jr. has a variety of related health problems, including morbid obesity, emphysema, diabetes, and arthritic knees. Wallace contends that these and other conditions render him disabled. He thus applied for disability insurance benefits and supplemental security income. An Administrative Law Judge ("ALJ"), acting on behalf of Defendant Commissioner of Social Security, reviewed Wallace's medical records, heard Wallace testify, and then denied his applications. Wallace now appeals that decision.

Before the Court for a report and recommendation (Dkt. 3) are the parties' cross motions for summary judgment. (Dkt. 10, Pl.'s Mot. Summ. J.; Dkt. 13, Def.'s Mot. Summ. J.)[1] For the reasons set forth below, this Court finds that the ALJ's narrative does not adequately demonstrate that he

_____

[1] On the docket, Defendant's motion is identified as a response to Plaintiff's motion. But the document is titled "Defendant's Motion for Summary Judgment." (Dkt. 13.) The Court therefore will treat what has been identified on the docket as a response as a motion. Substantively, this characterization is immaterial.

considered the combined effect of Plaintiff's physical impairments on Plaintiff's ability to stand and/or walk for six hours per day, five days per week. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 13) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Wallace graduated high school and later earned an associate's degree in medical assisting. (Tr. 71.) He then worked for a number of years as a home healthcare aide. (Tr. 206.) He last worked in 2008, when he worked about two hours per day as a home healthcare aide. (Tr. 74-75.) In November 2008, he was terminated from that job, but, apparently, not for reasons related to his health. (Tr. 74-75; *but see* Tr. 205.) Wallace has not worked since. (Tr. 74.)

### A. Procedural History

In November 2008, Wallace applied for disability insurance benefits and supplemental security income asserting that he became unable to work on November 7, 2008, when he was 48 years old. (Tr. 12.) On November 15, 2010, Wallace testified before Administrative Law Judge Elliot Bunce. (Tr. 67-93.) In a February 23, 2011 decision, ALJ Bunce found that Wallace was not disabled within the meaning of the Social Security Act. (*See* Tr. 12-20.) His decision became the final decision of the Commissioner of Social Security ("Commissioner") on March 23, 2012, when the Social Security Administration's Appeals Council denied Wallace's request for review. (Tr. 1.) Plaintiff filed this suit on April 5, 2012. (Dkt. 1, Compl.)

2

**B. Medical Evidence**

*1. Evidence of Wallace's Physical Impairments from Before the Alleged Disability Onset Date*

In January 2008, for a prior disability application, Wallace was evaluated by Dr. Scott Lazzara on behalf of Michigan's Disability Determination Service. (Tr. 243-47.)[2] Wallace told Dr. Lazzara that he had degenerative arthritis in his knees since 1988 and that he took Motrin for pain. (Tr. 243.) Wallace also reported being diagnosed with fibromyalgia a year earlier, and diabetes three years before that. (Tr. 243.) Wallace said he was using a CPAP machine for his sleep apnea but without much benefit. (*Id.*; *see also* Tr. 261-62.) Dr. Lazzara noted obesity: Wallace stood 6' 3" but weighed 400 pounds. (Tr. 244.) Wallace stated that he could lift 50 to 100 pounds off the floor but could only sit about 30 minutes, stand for about 15, and walk about two blocks. (Tr. 243.) With these limitations, Wallace was working only six hours per week as a healthcare aide. (Tr. 244.) Dr. Lazzara found that Wallace had "at least mild to moderate" degeneration in his knees, and, without weight loss, he would "likely require total knee arthroplasties." (Tr. 246.) As for Wallace's fibromyalgia, Dr. Lazzara did not find trigger point tenderness; he concluded, "I think [the fibromyalgia] is a component of his body habitus and poorly treated sleep apnea." (Tr. 246.)

Also in January 2008, Wallace went to the emergency room for back pain; an x-ray showed "moderate" loss of disc height at the T12-L1 and L5-S1 vertebrae and "minimal" spondyloarthrosis at L5-S1. (Tr. 250.)[3] Wallace followed up with chiropractic treatment from January 2008 to March

---

[2]Dr. Lazzara's report is dated January 2007, but the ALJ found that this was error that the evaluation occurred in January 2008. (Tr. 15.) The parties do not challenge this finding of fact on appeal and nothing shows that the ALJ plainly erred.

[3]"Spondyloarthritis (or spondyloarthropathy) is the name for a family of inflammatory rheumatic diseases that cause arthritis." Am. College of Rheumatology, *Spondyloarthritis*

2008. (Tr. 579-80.)

In June 2008, Wallace went to the emergency room with what appears to have been an anxiety attack. (Tr. 289-304.) An imaging study of Wallace's chest was negative. (Tr. 463.)

In July 2008, Wallace returned to the emergency room with complaints of abdominal pain. (Tr. 304-16.) A CT scan revealed a moderate-sized hernia. (Tr. 462.) A follow-up note indicates that Wallace had two prior hernia repairs. (Tr. 406.)

In September 2008, someone at Bayside Community Health Center ("Health Center") diagnosed Wallace with gastroesophageal reflux disease. (Tr. 404.) In October, however, Wallace reported that his heartburn was "not too bad." (Tr. 402.)

In November 2008, Wallace went to the emergency room with abdominal and chest pain. (Tr. 335; *see also* Tr. 332-52.) CT scans revealed a "mild" thoracic aortic aneurysm (a "weakened area in the upper part of the aorta") and the hernia. (Tr. 347); Mayo Clinic Website, *Thoracic Aortic Aneurysm*, http://www.mayoclinic.com/health/aortic-aneurysm/DS00017 (last visited May 22, 2013). The emergency-room discharge summary additionally indicates that Wallace had an anxiety reaction. (Tr. 351.)

Wallace also suffered from shoulder and wrist pain in 2008. In February, Wallace was prescribed Motrin for left shoulder and bilateral wrist pain. (Tr. 416.) Later that month, Wallace went to the emergency room with left wrist pain. It appears that Wallace was diagnosed with tendinitis and prescribed Naprosyn. (Tr. 254; *see also* Tr. 252-53, 468.) In May, someone at the Health Center assessed Wallace with left tennis elbow, "prior" carpal tunnel syndrome, and a neck

---

*(Spondyloarthropathy)*, http://www.rheumatology.org/practice/clinical/patients/ diseases_and_conditions/spondyloarthritis.pdf (last visited May 24, 2013). "The main symptom . . . in most patients is low back pain." *Id.*

4

strain. (Tr. 412.) Wallace was diagnosed with shoulder tendinitis in July 2008. (Tr. 407.) In September, Wallace went to the Health Center and reported that his left shoulder was still hurting "off and on." (Tr. 404.) His pain, however, was controlled by medication and his shoulder was not limiting activity. (*Id.*)

> ### 2. Evidence of Wallace's Physical Impairments from After the Alleged Disability Onset Date

In December 2008, Wallace went to the Health Center to follow up on his November emergency-room visit. (Tr. 401.) The exam notes indicate sharp epigastric pain and shortness of breath. (*Id.*) Wallace was assessed with morbid obesity, asthma, and atypical chest pain. (*Id.*) The plan was to refer Wallace to a cardiologist. (*Id.*)

January 2009 Health Center notes provide "[history] of asthma," "[history] of diabetes," and "[history] of thoracic aneurysm." (Tr. 398.) Wallace was assessed with increased weight (423 pounds), chronic obstructive pulmonary disease ("COPD"),[4] and deconditioning. (*Id.*)

In April 2009, Dr. Bret Bielawski performed a consultative examination of Wallace for Michigan's Disability Determination Service. (Tr. 494-97.) Wallace's chief complaints were fibromyalgia, diabetes, aortic aneurysm, high blood pressure and cholesterol, "panic," and COPD. (Tr. 494.) Although Wallace had stopped smoking, he admitted to a 25-year pack-per-day habit. (*Id.*) Dr. Bielawski also inquired into Wallace's knee problems. (*Id.*) Wallace provided that he had four

---

[4]"In the United States, the term 'COPD' includes two main conditions—emphysema and chronic bronchitis." National Heart, Lung, and Blood Institute, *What is COPD?*, http://www.nhlbi.nih.gov/health/health-topics/topics/copd/ (last visited May 27, 2013.) "In emphysema, the walls between many of the air sacs are damaged. As a result, the air sacs lose their shape and become floppy. This damage also can destroy the walls of the air sacs, leading to fewer and larger air sacs instead of many tiny ones. If this happens, the amount of gas exchange in the lungs is reduced." *Id.*

prior surgeries, the last in 1995. (*Id.*) Dr. Bielawski noted, "He can walk for about 20 feet before having to stop, he sits on a stool to do dishes and sitting is not a problem." (*Id.*) Regarding Wallace's obesity Dr. Bielawski remarked:

> [Mr. Wallace's morbid obesity] is certainly creating issue with his knees with advanced osteoarthritis. Range of motion is significantly diminished. There was no ligament laxity however. Again, he has had four surgeries to his left knee. He walks with a normal gait without the use of an assistive device. He had moderate difficulty doing orthopedic maneuvers. . . . There was accessory muscle use [to breathe when he moved] around the room. Pulmonary functions studies are enclosed for your review showing more of a restrictive pattern probably due to his obesity.

(Tr. 497.)

In November 2009, a CT scan revealed that Wallace's aortic aneurysm was "stable in appearance from the prior examination." (Tr. 548.)

In the fall and winter of 2009, Wallace sought treatment for pain in both shoulders. In September 2009, Dr. Branislav Behan examined Wallace's left shoulder. (Tr. 553.) Wallace told Dr. Behan that his shoulder pain had at least doubled over the past year. (*Id.*) The pain was made worse by overhead reaching and lying on the shoulder. (*Id.*) Wallace expressed concern about lifting patients at work. (*Id.*) Dr. Behan concluded that Wallace had acromioclavicular dysfunction, "impingement syndrome," and, possibly, a small rotator cuff tear. (*Id.*) He provided Wallace with an injection and gave Wallace a prescription for physical therapy. (*Id.*) At a Health Center appointment in November 2009, Wallace reported that his left shoulder still hurt, but, because of insurance reasons, he could not follow up with Dr. Behan. (Tr. 537.) The next month, Wallace returned to the Health Center with complaints that his other shoulder had popped and was painful. (Tr. 536.) Wallace was advised to rest, heat, and ice his right shoulder and perform "gentle" range-

6

of-motion exercises. (*Id.*) An x-ray of the right shoulder was negative for fracture, dislocation, or bone erosion. (Tr. 547.) By January 2010, Wallace's right shoulder had improved some, but he was still having pain off and on. (Tr. 535.) Additionally, Wallace's left shoulder still hurt, but not as bad as the right. (*Id.*)

In March 2010, Wallace underwent a sleep study to check his nightly CPAP titration. (Tr. 551-52.) Wallace reported not having slept the prior two weeks. (Tr. 551.) The study physician noted, "This study was characterized by difficulty initiating and maintaining sleep with a markedly delayed sleep onset, fragmented sleep, and a very poor sleep efficiency of 15%. There was only approximately 69.5 minutes of sleep during that entire study." (Tr. 552.) The study physician recommended, however, that Wallace continue using his CPAP at the existing pressure and set a follow-up exam for one year. (Tr. 552.)

In April 2010, Wallace began having right heel pain. (Tr. 550.) He went to the emergency-room and was provided with an injection. (*Id.*) According to the emergency-room physician, an x-ray appeared to reveal "a heel spur and calcification of the Achilles ligament." (*Id.*) At a follow-up at the Health Center, Wallace was diagnosed with a right ankle/Achilles' sprain. (Tr. 532.) He was given range of motion exercises and told to walk as tolerated. (*Id.*) A few days later in April, it was noted that Wallace's Achilles was tender to full extension. (Tr. 531.) Although the notes are difficult to read, it appears that Wallace was diagnosed with Achilles' tendinitis. (*Id.*)

In September 2010, Wallace went to the emergency room because of sharp stomach pains and bloody stools. (Tr. 586.) At a Health Center follow up a week later, Wallace was still reporting that his stomach ached constantly, but his stools were no longer bloody. (*Id.*) In late September, an ultrasound was performed of Wallace's upper abdomen. (Tr. 593.) It appears that he had been

experiencing acid reflux over the prior three weeks. (*Id.*) The ultrasound was largely unremarkable, showing only a "mildly" enlarged liver. (*Id.*)

### 3. Evidence of Wallace's Mental Impairments

Beginning at least in November 2007,[5] Wallace received treatment at Michigan Psychiatric & Behavioral Associates, P.C. ("Michigan Psychiatric"). (*See* Tr. 392.) He had regular appointments with two therapists: first Carol Robinson, then Helen Paquin. (*E.g.*, Tr. 364-74; Tr. 375-78.) He also attended group therapy led by Paquin. (*E.g.*, Tr. 371-74, 512, 514-16.) In therapy, Wallace discussed issues ranging from his divorce, the loss of a baby, and his relationship with his father. (*E.g.*, Tr. 372, 375, 378, 512.)

More directly relevant to Wallace's claims on appeal to this Court is his treatment with a psychiatrist at Michigan Psychiatric, Dr. Mukesh Lathia. At a November 2007 appointment with Dr. Lathia, Wallace reported that he was doing better on his current medication, Effexor, than on his prior medication, Paxil. (Tr. 392.) He told Dr. Lathia that he was working as a home healthcare aide and was attempting to obtain a bachelor's degree in health administration through an online program. (*Id.*) Dr. Lathia noted that Wallace's affect was "anxious, somewhat dysphoric, but better than before." (*Id.*) His diagnoses: major depression, recurrent; comorbid condition; panic disorder without agoraphobia. (*Id.*)

In December 2007, Wallace reported that his medications were working well and without side effects. (Tr. 391.) He still had anxiety, but a nurse at Michigan Psychiatric noted that it was "much better." (*Id.*)

---

[5]Wallace testified that he had been receiving mental-health treatment since 2003 or 2004 (*see* Tr. 73), but, perhaps because the alleged disability onset date is November 7, 2008, the administrative record does not date back that far.

In February 2008, Wallace asked to change back to Paxil, which he now thought was more effective than Effexor. (Tr. 376, 390.) Dr. Lathia began a taper of Effexor and started Paxil. (Tr. 390.)

The next month, Wallace saw William Lordon, a physician assistant at Michigan Psychiatric. (Tr. 388-89.) Wallace reported a small panic attack during the prior week. (Tr. 388.) He said he was experiencing a depressed mood three days per month. (*Id.*) Although Lordon noted that Wallace was "stable," he increased Wallace's dosage of Paxil because the medication was wearing off at the end of the day. (Tr. 389.)

In March 2008, Robinson, Wallace's first therapist, prepared a "Therapy Assessment Update." (Tr. 359.) She provided that Wallace continued to experience some depression and anxiety, "but less than when he started therapy." (Tr. 359.) Wallace had recently joined a club and increased his socialization. (*Id.*) That month, Dr. Lathia increased Wallace's Paxil prescription. (Tr. 387.)

Lordon noted in May 2008 that Wallace had been depressed "20 days out of 30 days—Mostly mild." (Tr. 385.) In early June 2008, Wallace reported two recent panic attacks that led to emergency-room visits. (Tr. 384.) At the end of the month, however, Lordon noted that Wallace had not had any further panic attacks. (Tr. 382.)

In September 2008, Dr. Lathia noted that Wallace was "doing better." (Tr. 380.) He continued Wallace's medications. (*Id.*)

In October 2008, Wallace reported depression at a six on a ten-point scale. (Tr. 379.) He was, however, working 30 hours per week. (*Id.*) A nurse at Michigan Psychiatric increased Wallace's Paxil dosage. (*Id.*) That month, Paquin, Wallace's second therapist, completed a "Therapy Assessment Update." (Tr. 354-57.) She noted that Wallace remained "somewhat depressed," but his

mood had "improved." (Tr. 355.) Paquin rated Wallace's Global Assessment Functioning score at 55. (Tr. 356.) (A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV*"), 30-34 (4th ed., Text Revision 2000). A score of 51 to 60 corresponds to "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *DSM-IV* at 34.)

In January 2009, Wallace again reported doing better. (Tr. 521.) Dr. Lathia had returned Wallace to Effexor and Wallace noted that he now preferred it over Paxil. (*Id.*) Wallace was still pursuing his online bachelor's degree. (*Id.*)

In February 2009, Bruce Douglass, Ph.D., apparently a psychologist, reviewed Wallace's medical file, including many of the treatment records from Michigan Psychiatric, and then completed a Mental Residual Functional Capacity Assessment form ("MRFC") and Psychiatric Review Technique form ("PRTF") for Michigan's Disability Determination Service. (Tr. 476-93.) On the MRFC, Dr. Douglass opined as follows:

> Cognition is intact. Concentration will vary, and he will have trouble keeping up in demanding work settings. Social functioning is restricted. Self care is OK. Adaptation is [within normal limits]. He retains the capacity to perform simple, routine, 2-step tasks on a sustained basis.

(Tr. 478.) On the PRTF, Dr. Douglass provided that Wallace had "mild" restrictions in activities of daily living, and "moderate" difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 490.)

In March 2009, Wallace returned to Dr. Lathia for another medication review. (Tr. 517.)

Wallace again said that he was doing better. (*Id.*) Dr. Lathia noted that he was participating in a support group. (*Id.*) He did not modify Wallace's medications. (*Id.*)

Wallace next saw Dr. Lathia in June 2009. (Tr. 513.) Dr. Lathia noted, "[t]he patient overall is doing okay." (Tr. 513.) Wallace was no longer attempting to earn his bachelor's online, however. (*Id.*) Dr. Lathia continued Wallace's medications. (*Id.*)

In October 2010, Dr. Lathia opined on Wallace's mental residual functional capacity. (Tr. 594-99.) He provided that due to his depression, Wallace was "unable to do even simple [activities of daily living], i.e., laundry, cooking, cleansing." (Tr. 594.) He believed that Wallace had "marked" to "extreme" limitations in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 597.) Dr. Lathia also found that Wallace was "markedly" limited in several concentration-related tasks, including performing activities within a schedule, maintaining regular attendance and being punctual and completing a normal workday without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 598.) He remarked that Wallace had a "long history of severe depression." (Tr. 599.)

### C. Testimony at the Hearing Before the ALJ

At his administrative hearing, Wallace told ALJ Bunce that he had worked until November 2008. (Tr. 74.) At that time, Wallace was working two hours per day as a home healthcare aide. (Tr. 75.) Wallace explained that he was terminated from that job for reasons not related to his impairments: "I was staying longer putting in more hours than what I was actually putting on record and they didn't like that because they thought I was getting too close to my clients and that I was doing more than what I was getting paid to do." (Tr. 75.) It was Wallace's opinion that he had been

11

performing his job satisfactorily. (*Id.*) (Notably, however, Wallace's "Disability Report - Adult" provides that Wallace was "fired due to medication condition." (Tr. 205.))

Wallace also testified to his physical limitations. He said that he could lift "five, maybe ten pounds at the most" throughout an eight-hour workday. (Tr. 79.) He stated that, because of his knees and shortness of breath, he could walk only about a block before needing to rest. (*Id.*) Wallace told the ALJ that his lower-back pain limited standing to about five minutes. (Tr. 80.) He also stated, "if I sit for a long time . . . I get real stiff." (*Id.*) Contrary to Dr. Lathia's opinion, Wallace acknowledged that he was able to do his own laundry, dishes, and cooking. (Tr. 72-73.)

Regarding his mental functioning, Wallace testified to concentration problems. He explained that a combination of his physical and psychiatric conditions limited his ability to stay on task to an hour-and-a-half on a good day but only "five, ten minutes" on a bad day. (Tr. 85.) Bad days, said Wallace, occurred "three, five times a month." (Tr. 86.) Wallace also testified that sometimes his depression prevented him from getting out of bed: "my body just aches all over and I don't care about anything. I just, my concentration's almost zero and I just want to stay in bed cover up, pull the covers up over my head and just ignore everything around me." (Tr. 86.) Apparently addressing a gap in his mental-health treatment, Wallace indicated that he resumed therapy at Michigan Psychiatric as soon as he resolved his insurance problems. (Tr. 87-88.)

Following Wallace's testimony, a vocational expert testified about whether jobs would be available for someone with functional limitations that the ALJ believed approximated Wallace's. The ALJ asked the vocational expert about job availability for a hypothetical individual of Wallace's age (he was then 50), education (associate's degree), and work experience who was capable of "light" work that required "no climbing, balancing, kneeling, crouching, or crawling, or more than

occasional stooping"; did not "expose the worker to poor ventilation or extremes of dust, humidity, and temperature"; and did not require "overhead work." (Tr. 90.) The vocational expert responded that there would be several jobs, each numbering in the tens-of-thousands in the national economy, that this hypothetical individual could perform: information clerk, inspector, and office clerk. (Tr. 90.)

The ALJ then limited the hypothetical individual further. He provided that the individual could perform only "simple, routine, repetitive tasks with one or two step instructions" and could not work in jobs with "strict production quotas," which the ALJ defined as "the requirement to produce a specified number of units or in a specified period of time." (Tr. 90.) The vocational expert testified that neither of these restrictions would preclude the three identified jobs. (*Id.*) In fact, upon cross examination by Wallace's counsel, the vocational expert explained that "generally if you're on task 80 percent of the day then . . . that's not going to interfere with employment." (Tr. 92.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

13

      2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

      3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

      4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

      5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

    At step one, ALJ Bunce found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of November 7, 2008. (Tr.14.) At step two, he found that Plaintiff had the following severe impairments: "diabetes, emphysema, degenerative joint disease of the shoulder and of the left knee, fibromyalgia, sleep apnea, obesity, depression, and anxiety." (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 14-16.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

      perform work that does not require: exertion above the light level as defined in 20 CFR 404.1567(b) and 416.967(b); or any climbing, balancing, kneeling, crouching, or crawling; or more than occasional stooping, or overhead work; or exposure to poor ventilation or extremes of dust, humidity, or temperature; or more than simple,

> routine, repetitious tasks, with one- or two-step instructions; or strict production quotas, defined as the requirement to produce a specified number of units or work in a specified period of time.

(Tr. 16.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 19.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 19.) The ALJ therefore concluded that Plaintiff was not under a "disability" as defined by the Social Security Act from the alleged onset date through the date of his decision, February 23, 2011. (Tr. 20.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within

15

which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

Plaintiff has asserted that the ALJ erred in six ways in concluding that he was not disabled. The Court finds substantial merit in Plaintiff's claim that the ALJ did not adequately address a number of his impairments, including obesity and sleep apnea. (Pl.'s Mot. Summ. J. at 10-12; *see also id.* at 20 (noting that ALJ did not consider interplay between obesity and sleep apnea); Pl.'s Reply at 3-4.) Accordingly, the Court begins with this claim of error.

### A. The ALJ Did Not Sufficiently Explain How Substantial Evidence Supports His Finding that Plaintiff Could Walk or Stand for Six Hours in an Eight-Hour Workday

Although the ALJ's residual functional capacity assessment restricted Plaintiff to a range of "light work," the ALJ did not reduce the standing and walking requirements of that exertional level. (Tr. 16.) The ALJ therefore believed that Plaintiff was capable of "a good deal of walking or standing," 20 C.F.R. §§ 404.1567(b), 416.927(b), "or walking, off and on, for a total of

16

approximately 6 hours of an 8-hour workday," S.S.R. 83-10, 1983 WL 31251, at *5. Moreover, the ALJ believed that Plaintiff could do this on a "regular and continuing basis;" i.e., "5 days a week, or an equivalent work schedule." S.S.R. 96-9p, 1996 WL 374185, at *2. The ALJ's narrative does not make clear how he reached this conclusion and it does not readily follow from the record evidence.

As an initial matter, Plaintiff's weight leads one to question his ability to stand or walk for six hours per day. Borrowing Plaintiff's words, at a weight of over 400 pounds and a height of 6' 3", his body mass index was an "astounding" 52. (Pl.'s Mot. Summ. J. at 19.) This body mass index places Plaintiff well above the "extreme" obesity threshold of 40—the highest level under the National Institute of Health Standards and the one that represents "the greatest risk for developing obesity-related impairments." S.S.R. 02-1p, 2002 WL 34686281, at *2. Related impairments push the Court from mere questioning to serious doubt.

First, Plaintiff suffered from sleep apnea. *See* S.S.R. 02-1p, 2002 WL 34686281, at *6 ("In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea."). At his CPAP testing in March 2010, Plaintiff indicated that he had not slept for two weeks. (Tr. 551.) This claim is supported by the fact that the study technician noted Plaintiff's "poor coloring." (*Id.*) It is further supported by the study itself; it was "characterized by difficulty initiating and maintaining sleep with a markedly delayed sleep onset, fragmented sleep, and very poor sleep efficiency at 15%." (Tr. 552.)

Second, Plaintiff suffers from emphysema. In turn, this disease caused Plaintiff to have difficulty breathing such that he needed to use "accessory muscle[(s)]" to breathe when moving around an exam room. (Tr. 497.) Dr. Bielawski also provided that Plaintiff's pulmonary studies

17

showed "more of a restrictive pattern probably due to his obesity." (*Id.*)

Third, Plaintiff has had four knee surgeries on the same knee. (Tr. 494.) His knees are such that Dr. Bielawski, without Plaintiff raising the issue, noticed problems. (*See* Tr. 494.) Dr. Bielawski opined that Plaintiff's obesity was "certainly creating issue with his knees with advanced osteoarthritis." (Tr. 496-97.) He also found that Plaintiff's knee range of motion was "significantly diminished." (Tr. 497.) In January 2008, Dr. Lazzara, another consultative examiner, found that Plaintiff had "at least mild to moderate" degeneration in his knees, and concluded that, without weight loss, Plaintiff would "likely require total knee arthroplasties," i.e., total knee replacement. (Tr. 246.) Notably, Plaintiff has gained rather than lost weight. (*See* Tr. 394 (367 pounds in July 2008), Tr. 581 (431 pounds in September 2010).) Indeed, Plaintiff explicitly told the ALJ that he had gained about 30 pounds since he stopped work in November 2008. (Tr. 74.)

Fourth, Wallace testified that, because of his knees and shortness of breath, he could walk only about a block before needing to rest. (Tr. 79.)

The Court recognizes that Social Security Ruling 02-1p provides that an ALJ is not required to make assumptions about a claimant's obesity:

> we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

S.S.R. 02-1p, 2002 WL 34686281, at *6. Still, the Ruling explicitly reminds ALJs that obesity may exacerbate other conditions: "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." S.S.R. 02-1p, 2002 WL 34686281, at *1. And it particularly discusses the interplay between obesity, sleep apnea, and

18

arthritic joints:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p[,] . . . our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . . In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea. The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

S.S.R. 02-1p, 2002 WL 34686281, at *6.

Yet the ALJ's narrative indicates that he did not consider the cumulative effect of Plaintiff's obesity-related impairments on his ability to stand and/or walk six hours per day, five days per week. When the ALJ discussed Plaintiff's obesity, he focused little on the combined effect of the three obesity-related impairments that the Court has identified:

> The claimant noted . . . at the hearing that he stands six feet three inches tall and weighs 430 pounds. At an initial nutritional consultation in January 2009, he weighed in at 413 pounds and was six feet three inches tall. The nutritionist found poor eating habits, morbid obesity, and diabetes mellitus (Exhibit 4F/7). A report later that month noted worsening morbid obesity and a history of a thoracic aneurysm. The diagnosis was COPD and deconditioning (Exhibit 4F/6).

> In his examination of the claimant in April 2009 (Exhibit 7F), Dr. Bielawski [found] normal musculoskeletal signs and noted that the claimant walked with a normal gait, without the use of an assistive device. Dr. Bielawski found that the claimant's morbid obesity was affecting his knees (Exhibit 7F). The RFC addresses the claimant's obesity by limiting him to light work that does not involve any climbing, balancing, kneeling, crouching, or crawling or more than occasional stooping. At his hearing before me, the claimant also

19

> testified to a recent emergency room visit due to knee pain and that
> he used a cane to walk long distances. However, I find no evidence
> that a cane has been prescribed to the claimant, and Dr. Bielawski
> found no use of an assistive device.

(Tr. 18.) As this quote makes apparent, the ALJ at best indirectly considered the effect of Plaintiff's obesity and one related impairment: his knee problems. Only after this analysis, however, did the ALJ address Plaintiff's sleep apnea: "The claimant testified to poor sleep but that he had not been taking naps recently. The claimant's poor sleep reasonably may be expected to limit his exertional capacity but not to the point that he cannot perform the limited range of light exertion specified in the RFC adopted here." (Tr. 18.) This statement is conclusory and provides the Court with no insight as to how Plaintiff's fatigue from poor sleep was considered in conjunction with his fatigue from carrying around a very large amount of weight for six hours. As for Plaintiff's emphysema, this too was not considered separately from Plaintiff's fatigue from obesity (and sleep apnea). The ALJ stated, "Dr. Bielawski diagnosed a moderate degree of emphysema. This condition is addressed in the RFC adopted here through the provision precluding exposure to poor ventilation or extremes of dust, humidity, or temperature." (Tr. 17.)

The ALJ's failure to adequately explain how the cumulative effect of Plaintiff's obesity-related impairments, coupled with a record that strongly suggests that Plaintiff cannot stand or walk for six hours per day, five days per week, leaves the Court to conclude that the ALJ did not consider the integrated effects of obesity-related impairments as contemplated by S.S.R. 02-1p. *Cf. Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (noting that an "ALJ's decision still must say enough 'to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)); *Grandchamp v. Comm'r of Soc. Sec.*, No. 09-10282, 2010 WL 1064144, at *10 (E.D. Mich. Jan. 25, 2010) *report adopted in relevant part by* 2010 WL

1064138 (E.D. Mich. Mar. 22, 2010) ("'While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision. Most importantly he must build an accurate and logical bridge from the evidence to his conclusion.'" (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000))). Although the Court doubts that substantial evidence supports a finding that Plaintiff could stand and/or walk six hours per day, five days per week, out of an exercise of caution, the Court recommends that an ALJ should have the opportunity to revisit that issue with instruction to consider the cumulative effect of all of Plaintiff's obesity-related impairments.

The Commissioner's arguments do not persuade the Court to reach a different conclusion. The Commissioner points to Dr. Bielawski's finding that Plaintiff had only "moderate" difficulty with orthopedic maneuvers and then notes that the ALJ restricted the range of light work by limiting or precluding certain postural movements. (Def.'s Mot. Summ. J. at 16-17.) The Commissioner also says that the ALJ "reasonably considered and weighed evidence relating to Plaintiff's sleep difficulties and moderate limitations of concentration, persistence, or pace." (*Id.* at 17.) But neither of these claims explains why Plaintiff, despite the combined effect of his "extreme" obesity, arthritic knees, sleep apnea, and emphysema, can stand or walk six hours per day, five days per week. This explanation is of particular import in this case given that no medical professional provided any physical residual functional capacity assessment of Plaintiff. The Court therefore believes that this case should be remanded for the ALJ to consider and discuss the cumulative effect of Plaintiff's impairments on Plaintiff's ability to stand and walk.

Although the Court recommends remand, in the interest of streamlining those proceedings, the Court addresses Plaintiff's other claims of error to the extent that they pertain to the ALJ's

analysis of his mental impairments.

### B. Plaintiff Has Not Shown That the ALJ Erred in Crediting Dr. Douglass' Opinion Over Dr. Lathia's

Under the treating-source rule, the opinions of a claimant's treating physicians are generally given more weight than those of non-treating physicians because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). In fact, if the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," then an ALJ must give the opinion "controlling" weight. 20 C.F.R. §§ 404.1527(c)(2) 416.927(c)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And when an ALJ does not accord the treating physician's opinion controlling weight, he must consider the non-exhaustive list of factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c) to determine how much weight to assign the opinion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *accord Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

Additionally, the treating-source rule includes a procedural requirement that an ALJ provide "good reasons" for the weight he assigns a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. There are three reasons for this explanatory requirement: (1) "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason

22

for the agency's decision is supplied," (2) to "ensure[] that the ALJ applies the treating physician rule," and (3) to "permit[] meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. This procedural right is substantial: abridgement typically warrants remand even if substantial evidence supports the ALJ's disability determination. *See Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

Although Plaintiff's briefing is unclear, it appears that he claims that the ALJ violated this explanatory aspect of the treating-source rule. He says:

> [T]he ALJ rejected the opinions of Claimant's long-time treating psychiatrist, Dr. Lathia. The reasons for this rejection of the opinion of Dr. Lathia is simply conclusory and fails to persuasively enunciate a reason for the rejection of the well-stated opinion of the Claimant's long-time treating psychiatrist. Thus a remand is required to address this failing in the ALJ's Decision.

(Pl.'s Mot. Summ. J. at 17.)

The Court disagrees with Plaintiff; the ALJ explained, at considerable length, why he favored Dr. Douglass' state-agency opinion over Dr. Lathia's:

> As just discussed, treatment records for [Michigan Psychiatric] do not extend beyond June 2009 (Exhibits 3F, 10F). Dr. Lathia completed a form in October 2010 on which he stated that he was treating the claimant every 10 weeks (Exhibit 16F). I have considered the form and find that it is not controlling on the issue of disability (SSR 96-2p). The form assesses the claimant's global functioning at 40 and at the highest 55 during the past year. The form indicates a marked level of severity in social functioning and in maintaining concentration, persistence, or pace, with continual episodes of decompensation. I have compared these findings with the treatment notes from Dr. Lathia's facility. The notes show intact thought processes and provide no instance of severe exacerbation. There are eight treatment notes from Dr. Lathia in the period from November 2007, about a year before the claimant stopped working, through June 2009 (Exhibits 3F/27, 34, 37, 38, 39; 10F/2, 6, 10). In each note, the claimant's thought processes are found to be in order and he is noted as doing better. I am unable to find the basis in these notes for the

23

profound limitations reflected in the form.

I have given more weight to the expert opinion (SSR 96-6p) of the State agency [physician, Dr. Douglas], [who] concluded, as I do here, that the claimant's mental impairments are severe but not disabling (Exhibits 5F, 6F), because I find the opinion more consistent with the treatment notes and with the fact that the claimant has not required other than conservative treatment. The State-agency opinion is supported by a [thorough] rationale.

(Tr. 15 (paragraphing altered).) Restated briefly: the ALJ found that Dr. Lathia's rather extreme limitations were not supported by the Michigan Psychiatric treatment records and were contrary to Dr. Douglass' opinion, which was more consistent with those records. This is a clear rationale that satisfies the explanatory aspect of the treating-source rule.

To the extent that Plaintiff's argument extends beyond procedure, the Court further finds that substantial evidence supports the ALJ's rationales. As set forth in detail in Part I.B.3., the Michigan Psychiatric treatment records do not show the type of severe depression and anxiety reflected in Dr. Lathia's opinion. In December 2007, a nurse at Michigan Psychiatric noted that Plaintiff's anxiety was "much" better. (Tr. 391.) In March 2008, Plaintiff had joined a club and increased his socialization; therapist Robinson noted that Plaintiff's concentration was "good." (Tr. 359-60.) In May 2008, physician assistant Lordon noted that Plaintiff had depression 20 out of 30 days but that the symptoms were mostly mild. (Tr. 385.) Plaintiff's anxiety symptoms were also identified as mild. (*Id.*) In October 2008, Plaintiff's counselor provided a GAF score indicating moderate symptoms. (Tr. 356.) In December 2008, Plaintiff completed a function report stating that he did not have problems with memory, completing tasks, or concentration, and that he could pay attention for "as long as needed." (Tr. 193.) In June 2009, Dr. Lathia himself noted, "[t]he patient overall is doing okay." (Tr. 513.) Thus, Dr. Lathia's opinion that Wallace had "marked" to "extreme" limitations in

24

maintaining social functioning and in maintaining concentration, persistence, or pace (Tr. 597) is incongruent with the longitudinal record. At a minimum, it was reasonable for the ALJ to reach that conclusion. The Court therefore finds no reversible error in the ALJ's decision to credit Dr. Douglass' opinion over Dr. Lathia's.

It follows from this finding that the Court finds unpersuasive Plaintiff's argument, raised for the first time in his reply brief, that the ALJ reversibly erred in failing to credit Dr. Lathia's findings that Plaintiff was "markedly limited" in his ability to maintain regular attendance and punctuality. (Pl.'s Reply at 2-3.)

### C. Plaintiff Has Not Shown that the ALJ Reversibly Erred in Excluding Further Concentration, Persistence, or Pace Limitations in the Residual Functional Capacity Assessment

Plaintiff argues that the ALJ's residual functional capacity assessment, and corresponding hypothetical to the vocational expert, do not "accurately portray," *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010), his mental impairments because they fail to adequately account for his "moderate" limitations in maintaining concentration, persistence, or pace ("CPP"). This Court has addressed similar arguments on several prior occasions, most recently in *White v. Comm'r of Soc. Sec.*, No. 12-12833, slip report and recommendation (E.D. Mich. Apr. 26, 2013) (Michelson, M.J.).[6] *See also Lamb v. Comm'r of Soc. Sec.*, No. 10-14645, 2011 U.S. Dist. LEXIS 153641, at *39-59 (E.D. Mich. Dec. 1, 2011) (Michelson, M.J.), *report and recommendation adopted*, 2012 U.S. Dist. LEXIS 25222 (E.D. Mich. Feb. 28, 2012) (Duggan, J.). The argument is usually structured as follows: "at step three of the five-step disability analysis the ALJ found that the claimant has 'moderate' limitations in CPP, but then, inconsistently, the ALJ merely limited the claimant to

---

[6]Objections to this Court's report and recommendation in *White* are pending.

'unskilled' or 'simple' work in the residual functional capacity assessment." Based on this debatable

inconsistency, and the belief that claimants may be considerably off-task or behind pace even when

performing "unskilled" or "simple" work, courts in some cases have remanded for the ALJ to

include CPP-specific limitations. *See White*, No. 12-12833, slip report and recommendation at 19-23

(E.D. Mich. Apr. 26, 2013). In other cases, courts have relied on a credible medical opinion

providing that the claimant had "moderate" limitations in CPP, but could still perform unskilled

work on a sustained basis, to conclude that residual functional capacity limitations of "unskilled"

or "simple" work capture the claimant's CPP limitations. *See id.* at 23-25.

Like these cases, at step three of the five-step disability analysis, ALJ Bunce concluded that

Plaintiff had "moderate" limitations in maintaining CPP. (Tr. 16.) But unlike the ALJs in those

cases, ALJ Bunce included a quota limitation in his residual functional capacity assessment and

corresponding hypothetical to the vocational expert. (Tr. 16, 18.) As he explained:

> I find that the claimant has moderate difficulty maintaining
> concentration, persistence, or pace. He testified to poor concentration,
> but he also said that he performed his last job satisfactorily and
> stopped only because of a dispute over time records. The claimant's
> impairments reasonably may be expected to limit him in these areas
> but not to the point that he cannot perform the simple tasks, without
> strict production quotas, specified in the residual functional capacity
> adopted here (finding 5).
>
> * * *
>
> The specification of simple tasks, without strict production quotas,
> addresses any shortcomings in the claimant's concentration,
> persistence, or pace caused by his mental impairments.

(Tr. 16, 18.) In essence, Plaintiff argues that limitations to "unskilled" and "simple" work coupled

with a prohibition on tasks with strict production quotas do not capture his moderate CPP problems.

The Court disagrees.

26

As discussed, Plaintiff's mental-health records do not indicate severe symptoms stemming from his depression and anxiety. Moreover, the Court notes that the vocational expert testified that the jobs she identified would tolerate being off-task up to 20 percent of the workday. (Tr. 92.) Plaintiff has not cited record evidence—other than Dr. Lathia's reasonably-discredited opinion—indicating that his concentration, persistence, or pace problems are such that he would be off task more than 20 percent of the workday. Accordingly, the Court finds no reversible error in the ALJ's omission of further CPP-specific limitations.

### D. Plaintiff Has Not Shown That the ALJ Erred in Discounting His Testimony Regarding His Mental Impairments

An ALJ's credibility assessment proceeds in two steps. *Baranich v. Barnhart*, 128 F. App'x 481, 487 (6th Cir. 2005). First, the ALJ determines whether the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(c)(1); *Baranich*, 128 F. App'x at 487. If so, the ALJ then evaluates the "intensity and persistence" of the claimant's symptoms. 20 C.F.R. § 404.1529(c)(1). At this second step, the ALJ should not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. To the contrary: the regulations list other considerations that should inform the ALJ's credibility assessment. 20 C.F.R. § 404.1529(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.,* 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

27

weight the adjudicator gave to the individual's statements and the reasons for that weight," S.S.R. 96-7p, 1996 WL 374186 at *2.

Within the above framework, an ALJ's credibility analysis warrants considerable deference: a court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."). Further, an ALJ's credibility analysis is subject to harmless error review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (citing *Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d 1155, 1162 (9th Cir. 2008) with approval); *Carmickle*, 533 F.3d at 1162 ("So long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal." (quotation marks omitted and punctuation altered)).

The specifics of Plaintiff's credibility argument are not clearly articulated. (*See* Pl.'s Mot. Summ. J. at 15.) After reciting several pages of law governing an ALJ's credibility analysis, Plaintiff states:

> As previously discussed, the ALJ's finding on credibility is contrary to the record and Claimant's extensive history of psychiatric and physical disabilities. Claimant sought psychiatric care for many years. Why would this be the case unless the Claimant suffered from serious and ongoing concerns? The ALJ's opinion is contrary to the weight of the evidence on this issue.

(Pl.'s Mot. Summ. J. at 15.) Absent the reference to "[a]s previously discussed," Plaintiff's credibility argument is so undeveloped that it would be fairly deemed forfeited. *See Kennedy v.*

28

*Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003). "As previously discussed," however, apparently refers to an earlier part of his brief regarding his depression, emphysema, and shoulder pain. (Pl.'s Mot. Summ. J. at 4-5.) The Court, therefore, will address Plaintiff's claims that the ALJ erred in discounting his testimony about his depression and shoulder pain.[7]

Plaintiff faults the ALJ for discrediting his testimony that, on a good day, he could concentrate for 90 minutes, but, on a bad day, only five or ten minutes. (*See* Tr. 85.) Relatedly, Plaintiff claims that the ALJ erred in discounting his statements that there were days when he could not get out of bed because of his depression. (*See* Tr. 86.) But, for reasons already discussed, the ALJ reasonably read Plaintiff's mental-health treatment notes as inconsistent with this level of impairment. Further, as particularly relevant to Plaintiff's credibility, Plaintiff himself reported that he did not have problems with memory, completing tasks, concentration, or paying attention. (Tr. 193.) The ALJ therefore had valid reasons for discounting Plaintiff's testimony about his depression and concentration.

Plaintiff also claims that the ALJ erred in rejecting his allegations about his shoulder pain. (Pl.'s Mot. Summ. J. at 5.) Plaintiff does not identify the testimony he refers to. He apparently relies on his testimony that he has problems with his left shoulder and that he would not be able to engage in overhead work. (Tr. 80-81.) But the ALJ accounted for this testimony: "The RFC adopted here addresses [the claimant's shoulder] condition through the provisions prohibiting climbing, balancing, kneeling, crouching, crawling, more than occasional stooping, or *overhead work*." (Tr.

---

[7]Because the Court recommends remand for consideration of the combined effects of Plaintiff's obesity, sleep apnea, knee problems, and emphysema, the Court will not address whether the ALJ erred in discounting Plaintiff's testimony about his shortness of breath. (*See* Tr. 77, 79.)

18 (emphasis added).) Accordingly, the Court finds no error in this regard.[8]

### E. Plaintiff Has Not Shown That the ALJ Reversibly Erred in Considering Plaintiff's Global Assessment Functioning Scores

Plaintiff claims that the ALJ did not give adequate consideration to his GAF scores. (Pl.'s Mot. Summ. J. at 16.) In the context of discussing Dr. Lathia's opinion, the ALJ provided: "The form assesses the claimant's global functioning at 40 and at the highest 55 during the past year." (Tr. 15.) Plaintiff contends that this statement shows that the ALJ erred: "It appears that the ALJ simply gravitated toward the highest GAF score without serious analysis of the reasons for the changes or for the particularly depressed score of 40." (Pl.'s Mot. Summ. J. at 16.)

_____

[8]Although the Court does not opine one way or the other, the ALJ arguably gave a valid reason for discounting Plaintiff's testimony generally. In particular, Plaintiff testified that he had received employment benefits and, in connection with those benefits, he indicated that he was ready, willing, and able to work. (Tr. 72.) The ALJ recognized the inconsistency between this position and a claim of disability:

> I note also that, by his testimony, the claimant received unemployment benefits from November 2008, the alleged onset of disability, through October 2010, when his eligibility expired, certifying during this period that he was ready, willing, and able to work. This certification does not itself prove a lack of disability, but there is an apparent conflict between the certification and the claimant's position here that there is no full-time work he is able to perform.

(Tr. 17 n.2.) On remand, the ALJ should determine whether further fact-finding in support of his analysis is necessary. _See Workman v. Comm'r of Soc. Sec._, 105 F. App'x 794, 801 (6th Cir. 2004) ("Applications for unemployment and disability benefits are inherently inconsistent."); _Smith v. Astrue_, No. 10-12648, 2011 WL 3897752, at *5 (E.D. Mich. July 6, 2011) ("This Circuit has found that the collecting of unemployment benefits (requiring recipients to state that they are seeking work) stands at odds with allegations of disability under the Social Security Act."), _report and recommendation adopted_, 2011 WL 3897800 (E.D. Mich. Sept. 6, 2011); _Carmickle v. Comm'r, Soc. Sec. Admin._, 533 F.3d 1155, 1161-62 (9th Cir. 2008) ("[W]hile receipt of unemployment benefits can undermine a claimant's alleged inability to work fulltime, . . . the record here does not establish whether Carmickle held himself out as available for full-time or part-time work. Only the former is inconsistent with his disability allegations.").

The ALJ did not reversibly err in considering Plaintiff's GAF scores. First, Dr. Lathia's opinion is the only source of the GAF score of 40. (Tr. 594.) The Court has already concluded that the ALJ reasonably discounted that opinion. Second, GAF scores are not especially probative of a claimant's functioning. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("Because the final GAF rating always reflects the worse of [severity of symptoms and functional level], the score does not reflect the clinician's opinion of functional capacity." (internal quotation marks and citation omitted)); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place. . . . If other substantial evidence (such as the extent of the claimant's daily activities) supports the conclusion that she is not disabled, the court may not disturb the denial of benefits to a claimant whose GAF score is as low as Kornecky's [40-45, 46, 52, 50-55] or even lower."); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("[T]he Commissioner 'has declined to endorse the [Global Assessment Functioning] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [Global Assessment Functioning] scores have no direct correlation to the severity requirements of the mental disorders listings.'" (quoting *Wind v. Barnhart*, No. 04-16371, 2005 WL 1317040, at *6 n.5 (11th Cir. June 2, 2005))). Given that the ALJ could discount Plaintiff's low GAF score as an indicator of functioning, and given the moderate GAF score provided by Plaintiff's counselor, Plaintiff's speculation about the ALJ's insufficient consideration of Dr. Lathia's low score does not demonstrate reversible error.

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ's narrative does not adequately demonstrate that he considered the combined effect of Plaintiff's physical impairments on Plaintiff's ability to stand and/or walk for six hours per day, five days per week. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 10) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 13) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

                                       s/Laurie J. Michelson
                                         LAURIE J. MICHELSON
                                         UNITED STATES MAGISTRATE JUDGE

Dated:  June 11, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 11, 2013.

                                         s/Jane Johnson
                                         Deputy Clerk